UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>      Plaintiff,<br><br>      v.<br><br>KRM SERVICES, LLC and ROBERTO J. CLARK, JR.,<br><br>      Defendants. | Case No. 1:19-cv-1424<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff, the U.S. Securities and Exchange Commission (the "Commission" or "SEC"), for its Complaint against Defendants KRM Services, LLC ("KRM") and Roberto J. Clark, Jr. ("Clark") alleges as follows:

**SUMMARY**

1.      From December 2016 to approximately February 2019, Clark engaged in a fraudulent scheme to solicit individuals to make short-term loans to KRM, a company that Clark controlled, and to invest in unregistered securities issued by KRM.  Clark claimed that KRM needed funds to market and develop its "JetBoard," a motorized surfboard, and that KRM already had pending orders for the surfboard.  In fact, KRM had no orders or contracts for any products and Clark diverted most of the approximately $350,000 that he obtained from multiple investors to his personal use.

2.      In furtherance of the scheme, Clark offered unregistered securities, made material misrepresentations about KRM's business, provided investors with fabricated purchase orders, and

engaged in other deceptive acts to convince prospective investors that KRM had income from which KRM could repay the loans.

3. Defendants' misappropriation, materially false statements, and related deceptive acts violated the antifraud provisions of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), and the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), as well as the registration provisions of the Securities Act, 15 U.S.C. § 77e(a) and (c). The Commission respectfully requests, among other things, that the Court enjoin Clark and KRM from committing further violations of the federal securities laws as alleged in this Complaint; issue a conduct-based injunction prohibiting Defendants from participating in the issuance, offer, or sale of any security; and order Defendants to pay disgorgement, plus pre-judgment interest, and monetary penalties based upon these violations.

**DEFENDANTS**

4. **KRM** is a Florida limited liability company incorporated by Roberto J. Clark, Jr. During the time period at issue, KRM had a principal place of business in Arlington, Virginia and Chevy Chase, Maryland.

5. **Clark** was KRM's founder, manager, and majority owner during the time period at issue. At all relevant times, Clark controlled KRM. Clark offered and sold securities to investors from KRM's places of business in Maryland and Virginia. The majority of Clark's securities solicitations were conducted in Alexandria and Fairfax, Virginia.

**JURISDICTION AND VENUE**

6. The Court possesses jurisdiction over this action and authority to grant the relief requested pursuant to Sections 20 and 22 of the Securities Act, 15 U.S.C. §§ 77t and v, and Sections 21 and 27 of the Exchange Act, 15 U.S.C. §§ 78u and aa.

7. Venue is proper in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v, and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa, because Defendants offered and sold unregistered securities and violated the antifraud provisions of federal securities laws in this District. Defendants met with prospective investors at offices, restaurants, and other locations in Vienna, Chantilly, Fairfax, and McLean, Virginia for the purpose of soliciting investments in unregistered securities. Defendants' solicitations, which included misrepresentations and other deceptive acts, resulted in at least eighteen contracts for the sale of unregistered securities to residents of Fairfax, Manassas, and Springfield, Virginia.

8. In connection with the conduct alleged in this Complaint, Defendants made use of the means or instruments of transportation and communication in interstate commerce. Among other things, Defendants used email, telephone, and bank wires to perpetrate their scheme.

**FACTS**

**I. Clark Engaged in an Unregistered Offering of Securities.**

9. In December 2016, Clark founded KRM ostensibly to "introduce and re-energize the watersports market with new innovative, market changing products," according to a Prospectus and Private Placement Memorandum ("PPM") that Clark distributed to potential investors. More specifically, KRM claimed in the PPM to have exclusive rights to sell in the United States a motorized surfboard called the "Jetboard."

10. From approximately December 2016 through approximately February 2019, Clark solicited investors in Chantilly, Fairfax, McLean, Manassas, Springfield, and Vienna, Virginia, as well as in Maryland and Pennsylvania. Clark offered investors KRM promissory notes (the "Notes") and equity interests in KRM itself (the "LLC Interests").

11. Clark made offers to investors he met in public social settings such as bars, restaurants, and adult entertainment establishments. Clark then asked some of these investors to introduce him to other individuals who might also be interested in investing in KRM's unregistered securities.

12. In the spring of 2017, KRM issued invitations via email to prospective investors for a "gala" on a yacht on the Potomac River that would include a demonstration of the Jetboard. Clark provided a demonstration for over 20 potential customers at the June 2017 gala, where Clark distributed a PPM that offered investors up to $1 million in KRM promissory notes.

13. Notwithstanding the existence of the PPM, Clark offered the KRM securities to any and all interested investors; did not restrict investments to those who had special knowledge about the Notes or KRM or to those who had access to the same kind of information about the Notes and KRM that would be included in a properly filed registration statement; and offered such securities to those with whom Clark and KRM had no prior business relationship.

14. In response to Clark's solicitations, multiple investors invested approximately $350,000 in KRM securities. Clark failed to undertake any reasonable efforts to determine whether the individuals that he solicited to invest in KRM were "accredited investors" as defined by Rule 506 of Regulation D of the Securities Act, 17 C.F.R. § 230.506.

15. The Notes and the LLC Interests are securities. Clark sold these instruments as notes of indebtedness, certificates of interest in KRM, profit-sharing agreements, and as investments in a common enterprise where investors were led to expect profits solely from KRM's efforts in the watersports industry.

16. No registration statement ever was filed or in effect for the Notes or the LLC Interests, and no exemption from the registration requirements of the Securities Act applied.

17. Clark's efforts resulted in at least eighteen contracts for the sale of unregistered securities to residents of Fairfax, Manassas, and Springfield, Virginia.

18. Clark used means and instrumentalities of interstate commerce to solicit investments. After making an initial pitch to an investor at an in-person meeting, and as a further inducement to invest, Clark often sent email and text messages to the prospect with additional information about KRM, the Jetboard, and/or the status of KRM's sales efforts. Clark also sent via email draft agreements documenting the investments. Some investors paid KRM through wire transfers.

## II.    Clark Made Misrepresentations in Furtherance of his Fraudulent Scheme.

19. In furtherance of the scheme, Clark made a variety of material misrepresentations.

20. For the purpose of securing investments, Clark told investors that KRM needed funds to fulfill existing and forthcoming purchase orders for the Jetboard and that KRM intended to use the offering proceeds for that purpose. In reality, at no time did KRM have any purchase orders for the Jetboard. Clark further claimed that these nonexistent purchase orders and other unidentified contracts would garner large profits for KRM. For example:

   a. In or about April 2017, Clark told Investors 1 and 2 that KRM needed funds to fulfill an order placed by a major international cruise line for a large shipment of Jetboards. KRM issued promissory notes to Investors 1 and 2, both signed by Clark, that stated, "Said investment will be used in the Surfboard #1002" followed by the initials of the cruise line. Clark obtained approximately $13,800 by means of these false statements.

   b. In or about May 17, 2017, Clark emailed Investor 3 and attached a 30-day revenue/sales projection showing that KRM had sold 25 Jetboards and 10 kayaks

for an anticipated profit of $136,000. The projection also showed that KRM had rented Jetboards and Kayaks to establishments in Ocean City, Maryland and Fort Meyers, Florida, for an anticipated yearly profit of $980,930. In May and June 2017, KRM issued promissory notes to Investor 3, signed by Clark, stating that KRM would use the loans for "Surfboard #1004" followed by the initials of Rental Equipment Company 1, and "Surfboard #1006" followed by the initials of Rental Equipment Company 2. Clark obtained approximately $36,000 by means of these false statements.

c. On or about September 15, 2017, Clark offered KRM securities to prospective Investor 4. In the written solicitation, Clark claimed that KRM had "been awarded a purchase order/contract for 40 units of our jet surfboard," with Rental Equipment Company 3, which would net $118,750 in profits for KRM within 45 days.

d. On or about October 20, 2017, Clark executed a Memorandum of Understanding memorializing a loan from Investor 5 to KRM. The Memorandum of Understanding included a statement that the loan was "for manufacturing" related to a "Purchase Order/Contract:" followed by the name of Rental Equipment Company 3. Clark obtained approximately $59,000 by means of this false statement.

21. These representations, and similar representations Clark made to other investors for the purpose of securing investments, were false. In fact, KRM had no contracts for the Jetboard (or any other products), did not need or intend to use any funds raised to fulfill these non-existent contracts, and had no realistic prospect of revenue from the non-existent contracts. Clark obtained approximately $350,000 from investors by means of these and similar false statements.

**III.    Clark Committed Additional Deceptive Acts in Furtherance of his Fraudulent Scheme.**

22.    In addition to misrepresentations, Clark committed additional deceptive acts in furtherance of the fraudulent scheme.

23.    To induce investors to make loans to KRM and to keep unpaid investors complacent, Clark provided investors with fabricated purchase orders for the Jetboard, emails referencing purported meetings and contract negotiations with cruise lines and other potential buyers that simply never occurred, and a fabricated patent opinion.  For example:

   a. In April 2017, Clark showed Investors 1 and 2 a purported contract between KRM and a major cruise line to induce them to invest.  Investor 2 used the contract to recruit friends and family members to also invest in KRM securities.  In fact, KRM had no contract with the cruise line; Clark had fabricated it.

   b. On September 15, 2017, Clark attempted to induce prospective Investor 4 to make a loan to KRM, and provided him, via email, with a purported signed and notarized purchase order from Equipment Rental Company 3.  But KRM had no purchase order from Equipment Rental Company 3.

24.    To keep the scheme from collapsing once the Notes became due, Clark provided investors with false assurances that payments from buyers were imminent, gave investors checks that bounced, and created false bank records showing funds in KRM's accounts that did not exist. For example:

   a. On December 3, 2017, after Notes with Investors 2 and 3 were past due, Clark forwarded both investors an email, purportedly from Attorney 1, in which Attorney 1 summarized a supposed meeting that had occurred between KRM and Attorney 1's "clients."  The email stated, "I have personally given approval to our clients to

7

    begin the contracts process. . . . You should be receiving draft 'sample' contract documents from [Attorney 2] to begin your review process in the next couple days. Congratulations again!" Attorney 1 did not send this email. Clark sought to amplify the effect of Attorney 1's supposed email by stating that the expected profit from the deal was $2 million. Clark's email to Investor 3 also included the exhortation, "Don't give up on me!!!!!!"

    b. On December 27, 2017, several months after an initial promissory Note was signed with Investor 5, Clark forwarded to him an email, purportedly from an attorney at Cruise Line 1, confirming a letter of intent to purchase 1,000 units "in accordance to the agreed upon terms and conditions from our December 22, 2017 meeting . . . please expect an executable contract within 5-7 days." Attorney 3 did not send the email.

    c. On January 9, 2018, Clark gave three checks to Investor 5 to repay her investment in KRM. The first check bounced and Investor 5 contacted Clark for an explanation. Clark texted Investor 5 a screen shot of a bank account showing $299,943.66 in funds and further texted, "Plenty of money in there. We are figuring out why check didn't go thru." The screen shot, however, was of a different bank account than that on which the checks were written. When Investor 5 pointed this out to Clark, he ceased communicating with her. When Investor 5 presented the two other checks to KRM's bank, the bank informed her that KRM's account had insufficient funds to cover the checks.

25.     Clark misappropriated almost all of the investor funds for his personal use or to pay earlier investors with the funds of later investors. For example, in 2017 and 2018, Clark made the

following payments for personal expenses using investor funds: at least $41,000 to restaurants and bars; at least $19,000 to hotels; at least $15,000 to family members; at least $8,000 to department and clothing stores; at least $5,000 to convenience and gas stores; at least $3,000 to grocery and liquor stores; at least $1,000 to gyms; at least $1,500 to spas and beauty salons; at least $1,000 to pet stores and groomers; and at least $200 to a bail bondsman. On or about June 8, 2017, Clark used later investor funds to repay a $10,000 capital contribution of an earlier investor.

26. On March 8, 2018, the Fairfax County Police Department arrested Clark in connection with certain aspects of his fraudulent scheme. Notwithstanding his arrest, Clark continued to solicit new investors as late as February 2019, when the FBI recorded Clark attempting to solicit a new investor by telephone in Pennsylvania.

**IV.    KRM is Liable for Clark's Actions.**

27. KRM is liable for Clark's actions because Clark was the majority owner of KRM and controlled it. Per KRM's Operating Agreement, Clark, as the majority interest holder, had the authority for "all decisions and documents relating to the management and operation of [KRM]." Clark signed all of the Notes on KRM's behalf, was the main point of contact for KRM investors and personally solicited most if not all of them, prepared or caused to be prepared the PPM, supervised all of KRM's employees, drafted the fictitious purchase orders and contracts for the Jetboard, was an authorized signatory on KRM's bank accounts, and approved KRM's expenditures.

28. KRM is also liable for Clark's actions because Clark acted at all relevant times within the scope of his employment with KRM. Among other things, Clark's offering of unregistered securities, misrepresentations, and other fraudulent and deceptive acts were made

9

while Clark was soliciting investments on behalf of KRM and otherwise communicating with KRM investors. Soliciting investments and communicating with investors was within the ordinary scope of KRM's business.

## COUNT I
### Unregistered Offer or Sale of Securities
### Violations of Section 5(a) and (c) of the Securities Act

29. Paragraphs 1-28 are realleged and incorporated by reference herein.

30. From December 2016 through approximately February 2019, Clark conducted a general solicitation of investments in KRM in Virginia, Maryland, and Pennsylvania.

31. The investments were in the form of Notes and LLC Interests, which are securities.

32. No registration statement ever was filed or in effect for the Notes or LLC Interests.

33. No exemption to the requirement of registration applied to the Notes or LLC Interests.

34. Clark's offers and sales of the Notes and LLC Interests were made by telephone, emails, and text messages, which are means and instrumentalities of interstate commerce.

35. Clark did not undertake any reasonable effort to determine whether the individuals he solicited to invest in KRM were accredited investors.

36. KRM is liable for Clark's actions as Clark is the majority owner and operator of KRM and Clark's actions were made within the scope of his employment with KRM.

37. Defendants violated, and unless enjoined, will again violate, Section 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c).

## COUNT II
### Misrepresentations and other Deceptive Acts
### Securities Act Section 17(a)(1)-(a)(3) & Exchange Act Section 10(b) and Rule 10b-5(a)-(c) thereunder

38. Paragraphs 1-37 are realleged and incorporated by reference herein.

39. Clark engaged in a fraudulent scheme to solicit individuals to invest in KRM so that Clark could misappropriate the invested funds.

40. In furtherance of the fraudulent scheme, Clark made false statements of fact to prospective and existing investors to obtain money for himself and KRM. The misrepresentations were material because, among other things, reasonable investors would consider the facts that KRM had no contracts or purchase orders, and that Clark intended to misappropriate investors' payments to be important in deciding whether to invest in KRM. Clark and KRM obtained approximately $350,000 through these material misrepresentations.

41. Clark engaged in other deceptive acts in furtherance of the fraudulent scheme. Among other things, Clark fabricated contracts, purchase orders, and third-party emails; used investor funds to repay earlier investors; misappropriated investor funds for his personal use; and provided one investor with checks that did not clear KRM's account and then provided the investor with screen shots of a different bank account to support the false claim that KRM had sufficient funds to repay her.

42. Clark implemented the scheme in connection with the offer, purchase, and sale of the Notes and LLC Interests in KRM, which are securities.

43. Clark executed the scheme by telephone and e-mail, which are means and instrumentalities of interstate commerce.

44. Clark knew, or was reckless in not knowing, that his misrepresentations and deceptive acts would mislead investors. At a minimum, Clark failed to act with ordinary care.

45. KRM is liable for Clark's actions as Clark is the majority owner, control person, and operator of KRM and Clark's actions were made within the scope of his employment with KRM.

46.     Defendants violated, and unless enjoined will again violate, Securities Act Sections 17(a)(1)-(a)(3), 15 U.S.C. § 77q(a)(1)-(a)(3), Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5(a)-(c) thereunder, 17 C.F.R. § 240.10b-5(a)-(c).

## RELIEF REQUESTED

For these reasons, the Commission respectfully requests that this Court enter a final judgment:

a. Ordering Defendants to disgorge, with prejudgment interest, all ill-gotten gains received or derived from the activities set forth in the Complaint;

b. Ordering Defendants to pay civil penalties;

c. Permanently enjoining Defendants from directly or indirectly violating Sections 5 and 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder;

d. Permanently enjoining Clark from directly or indirectly, including but not limited to through any entity he owns or controls, participating in the issuance, offer, or sale of any security, provided, however, that such injunction shall not prevent Clark from purchasing or selling securities for his own personal account; and

e. Granting such other and further relief as may be necessary or appropriate.

## JURY TRIAL DEMAND

The Commission demands a jury trial on all issues triable of right by a jury.

Dated: November 8, 2019

Of Counsel:

Samantha M. Williams
MD Bar No. 12190024
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-5949
Tel: (202) 551-4061
Fax: (202) 772-9292
Email: williamssam@sec.gov
*Pro Hac Vice Motion Forthcoming*

Respectfully submitted,

/s/ Timothy K. Halloran
Timothy K. Halloran
VSB No. 48352
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-5985
Tel: (202) 551-4414
Fax: (202) 772-9292
Email: hallorant@sec.gov

*Attorneys for Plaintiff*
*U.S. Securities and Exchange Commission*